**SO ORDERED.**

**SIGNED this 29 day of April, 2025.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## NEW BERN DIVISION

IN RE:

CLASSIE B. DAWSON,                              Case No. 24-02832-5-JNC

　DEBTOR                                        CHAPTER 13

### ORDER REGARDING VALUATION OF COLLATERAL

The matter before the court is the Objection to Confirmation filed by 21st Mortgage Corporation ("21st Mortgage" or "Creditor") on October 2, 2024 (Dkt. 18, the "Objection"). The Objection centers on determining the value of a 1998 Fleetwood 76'x14' manufactured home (the "Collateral" or the "Manufactured Home") for plan confirmation purposes. The matter was heard on April 16, 2025, in Greenville, North Carolina. Attorneys Robert Fuller for the Debtor, Craig Haskell for 21st Mortgage, and Isaac Johnston for the Chapter 13 Trustee appeared at the hearing.

### JURISDICTION

The court has jurisdiction over the parties and the subject matter in this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. Valuation of

collateral for plan purposes is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The court has constitutional authority to hear and enter a final decision in this contested matter. *Wellness Int'l Network, Ltd., v Sharif*, 575 U.S. 665, 683, 135 S. Ct. 1932, 1947 (2015).

## BACKGROUND

Debtor Classie Dawson ("Debtor" or "Ms. Dawson") filed a voluntary petition for relief (Dkt. 1) under chapter 13 of the Bankruptcy Code on August 22, 2024 (the "Petition Date"). 21st Mortgage filed a proof of claim on August 30, 2024 ("Claim No. 2"), which reflects a loan balance of $22,156.23 secured by the Manufactured Home. Her chapter 13 case schedules and statements filed September 10, 2024 (Dkt. 14) lists its value at $4,890 Schedule A/B. Schedule D reflects 21st Mortgage as holding a claim of $22,156, but as secured only to the extent of the $4,890 asserted value, which leaves a $17,266 unsecured balance. Her proposed chapter 13 plan, also filed September 10, 2024 (Dkt. 13, the "Proposed Plan"), reasserts these same amounts.

Ms. Dawson bought the Manufactured Home used in 2016, borrowing the purchase money and pledging it as collateral. The Manufactured Home sits at 3414 Ponderosa Drive, La Grange, North Carolina 28551, where it serves as her primary residence. Ms. Dawson rents the underlying real estate, and the Manufactured Home has not been permanently affixed. The Manufactured Home remains personal property for lien perfection and valuation purposes. 21st Mortgage acknowledges its lien perfection is limited to the notation on the certificate of title issued under North Carolina law; it did not file a UCC-1 or continuation financing statement.

The Objection was timely filed and set for hearing with plan confirmation on November 6, 2024. That hearing has been continued at the request of the parties a number of times to provide time to obtain appraisals in support of the competing valuation positions. If the value is materially above the $4,890 asserted by Ms. Dawson, a plan amendment will be necessary.

At the hearing, Ms. Dawson testified on her own behalf as a lay witness, and Mr. Robert Keck testified on behalf of 21st Mortgage as an expert in mobile home valuations. No other witnesses were called. After consideration of the pleadings, testimony, documentary evidence, arguments of counsel, and other case record, the court finds and determines as follows.

## LAW AND ANALYSIS

### A. Valuation at Replacement Value

The Objection relates to confirmation, and 11 U.S.C. § 1325(a) dictates the confirmation requirements for a chapter 13 plan. Pertinent here, subsection 1325(a)(5)(B)(ii) directs that plan distributions to a secured creditor must equal "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim not less than the allowed amount of such claim." A secured claim is measured by the "creditor's interest in the estate's interest in such property" with any balance treated as unsecured. 11 U.S.C. § 506(a)(1). The secured claim's extent, validity, and value are determined under state law at "replacement value ... as of the date of the filing of the petition without any deduction for costs of sale or marketing." 11 U.S.C. § 506(a)(2). "Replacement value" is "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." *Id*.

An attempt to reduce the secured claim below the loan balance to an amount unacceptable to a secured creditor is known as a "cram down." See *Associates Commercial Corp v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). For plan confirmation purposes, the "cram down" reduction may not fall below "replacement value." See *In re Sweeney*, 556 B.R. 208, 214 (Bankr. E.D.N.C. 2016). In short, a chapter 13 debtor is entitled to retain collateral only if her plan provides for payment to the creditor of the petition date replacement value over the plan life. *In re Lamb*, 665 B.R. 603, 606 (Bankr. E.D.N.C. 2024).

B.  **Scope of Security Interest**

Before calculating "replacement value," the extent of property subject to lien attachment and the boundaries of lien perfection under applicable state law must first be determined.

1. **Lien Attachment**

For a security interest to attach to collateral under North Carolina law, (1) value must be given, (2) the debtor must have rights in the collateral or the power to transfer rights in the collateral, and (3) the debtor must authenticate a security agreement that provides a description of the collateral. N.C. Gen. Stat. § 25-9-203(b). To be a sufficient description, the security agreement must "reasonably identify" the collateral. N.C. Gen. Stat. § 25-9-108.

Ms. Dawson signed a consumer loan note and security agreement (POC 2-1 at 8, the "Note"), which included a grant of a security interest in: "(1) the Manufactured Home, and all accessions, attachments, accessories, replacements and additions to the Manufactured Home, whether added now or later. . . ." (*Id*.) The Note defines the collateral as consisting of "the manufactured home . . . together with the related services, furnishings, equipment, appliances, and accessories included with the manufactured home." (*Id*.) The interest is qualified by: "Lender is not granted, and does not have, a non-purchase money security interest in household goods." (*Id.*)

The Debtor does not contest 21st Mortgage holds a lien against the Manufactured Home; her objection extends to the collateral value after subtracting (a) items that were not accessions at the time of the sale and did not later became permanently affixed to it, (b) after-acquired, non-affixed personal property items, and (c) the cost of additional repairs needed.

2. **Perfection**

21st Mortgage maintains its security interest attaches to all improvements and accessions made to the Manufactured Home, but that does not relieve it from the duty to perfect the security

interests in the original collateral and added property under North Carolina law. While the lien notation on the certificate of title for Manufactured Home duly issued by the North Carolina Department of Motor Vehicles constitutes valid perfection of a secured claim under state law, that certificate of title notation only perfects the lien on the non-realty mobile home and its permanently affixed improvements and accessions thereto. N.C. Gen. Stat. §§ 20-58, 25-9-311(a)(2) , and 25-9-335. The lien is not perfected and extended to non-affixed personalty without filing a UCC-1 financing statement, which 21st Mortgage admits it did not do.

To determine whether an item or good is physically united with a mobile home to such an extent it has become "an accession," courts in North Carolina employ a two-part test: (1) whether the good at issue has become an "integral part of the property"; and (2) whether the good "could be conveniently detached." *Goodrich Silvertown Stores v. Caesar*, 214 N.C. 85, 87, 197 S.E. 698, 700 (N.C. 1938); see also *In re Sweeney* at 214. Consequently, any lien for personal property affiliated with (but not affixed to) the Manufactured Home is subject to avoidance or set aside under the hypothetical lien and strong arm rights of the bankruptcy estate and trustee under 11 U.S.C. § 544, a point 21st Mortgage does not contest. As a result, such items may not be considered in calculating the replacement value for section 506(a)(1) and (2) purposes.

C. **Valuation of the Manufactured Home**

1. **The Burden of Proof**

A chapter 13 debtor has the burden of proof to establish by a preponderance of the evidence the requirements for confirmation set out in 11 U.S.C. § 1325(a). *In re Brown*, 244 B.R. 603, 607 (Bankr. W.D. Va. 2000). A debtor "may and often should testify as to [their] opinion of value, and that may in appropriate cases be sufficient, but that opinion must be anchored to something." *In re Lamb*, 665 B.R. 603, 612 (Bankr. E.D.N.C. 2024). The debtor's burden applies in instances

where, such as here, a debtor seeks through their chapter 13 plan to modify a secured creditor's contractual rights via cramdown. *Id.* at 611.

### 2. Debtor's Testimony

In this case, Ms. Dawson testified she listed the Manufactured Home value at $4,890.00 solely relying on the county ad valorem tax value. She then summarily stated that in her opinion, given the present condition of the Manufactured Home, she would willingly sell the Manufactured Home for $8,000, thereby increasing her starting position. However, her testimony only indicated this is the amount she *would* accept for the Manufactured Home, not its "replacement value." She offered little by way of support that the replacement value of the Manufactured Home is $8,000, simply stating this is the amount she would sell it for in an "As Is" condition, without regard to the cost of needed repairs. She did not provide her own expert witness or appraisal. Since replacement value is the standard, and she gave no factual basis for the $8,000 figure such as comparable sales of other near-by mobile homes, little credence can be given to her unsupported asserted figure.

Ms. Dawson attempted to buttress her $8,000 valuation by submitting twenty-five recent photographs of portions of the Manufactured Home (windows, walls, doors, the exterior, and so on), which were introduced and allowed into evidence. (Debtor's Ex. 1-25.) She testified regarding the unit's current conditions and problems at length. Instead of carrying her burden on replacement value, this testimony and the photographs act as rebuttal evidence in addressing the scope and accuracy of the repairs credit and accessions asserted by Mr. Keck in his testimony and appraisal.

### 3. Value of the Manufactured Home

The Debtor having failed to meet her burden on value, 21st Mortgage then submitted expert witness testimony and an appraisal to establish replacement value. The Debtor, who has not filed an objection to Claim No. 2, also did not object to the unusual step of the creditor providing

evidence of a starting point for replacement value. In the absence of objection, and with the tacit consent of the parties, particularly where, as here, the chapter 13 case has been languishing confirmation-less for over eight months and Debtor is no nearer now to providing replacement value evidence than she was on the Petition Date. The court will therefore hear and consider the secured creditor's evidence in order to reach a value for the Manufactured Home for plan confirmation purposes and get the plan confirmation process back on track.

Having found it is appropriate to value the Manufactured Home, the analysis from *In re Sweeney* is instructive. *Sweeney,* 556 B.R. at 216. 21st Mortgage called Mr. Keck to testify as an expert witness regarding manufactured home valuation and appraisals. He has testified before this court as an expert on the same subject in prior cases, and in at least thirty other manufactured home value hearings in bankruptcy courts throughout the southeastern United States. No objection to the expert tender was made, and Mr. Keck was accepted as an expert able to testify on the condition, state, and value of the Manufactured Home.

Mr. Keck physically inspected the Manufactured Home on November 15, 2024 and prepared a written appraisal report dated November 16, 2024 (Dkt. 45, the "Appraisal") admitted into evidence as Creditor's Exhibit A. In the course of his testimony, he explained the manufactured home appraisal process along with his findings as to this specific item. He begins each appraisal by referencing the National Automobile Dealers Association ("NADA") Guide as of the date of petition. He then conducts a physical inspection, looking at all aspects of the unit before drafting his report, which is designed to assess the replacement value of that particular manufactured home. The replacement value is calculated by beginning with the corresponding "Floor Value" from the NADA Guide, and then making a State Location Adjustment to account for the local market. The result is the "Total Book Retail Value." That amount is then adjusted

based on the condition of the item, using the definitions set forth in the NADA guidebook (Creditor's Exhibit A at 9) from a five-level tier of: (1) Excellent; (2) Good; (3) Average; (4) Fair; and (5) Poor. The appraiser then conducts a condition adjustment to yield a "Total Adjusted Value of Used Home." From there, additional features are added to the value and the estimated cost of necessary repairs are deducted, which results in the "Total Adjusted (Retail) Value of Used Home and Optional Equipment" (the "Total Adjusted Retail Value").

In this case, Mr. Keck began with a Floor Value of $18,304.30. This initial figure was then adjusted upwards by one percent based on the market for manufactured homes in eastern North Carolina, which results in a rounded "Total Book Retail Value" of $18,487.34. He next determined the unit was in "fair" condition, which is defined as having, "Minor deterioration . . . apparent due to climate and/or deferred maintenance." (Creditor's Ex. A at 9). Applying the "fair" condition standard resulted in an 82% adjustment to the Total Book Retail Value, which totaled $15,159.62. He then found additional enhancing features valued at $8,245.00, and cost of necessary repairs totaling $5,655.32 subtracted therefrom, for a net adjustment of plus $2,589.68. Mr. Keck concludes the Total Adjusted Retail Value of the Manufactured Home is $17,749.30.

21st Mortgage's asserted value of $17,749.30 sets forth a basis for the replacement value, assuming the facts underpinning the Appraisal are correct. However, 21st Mortgage has attempted to assert liens against items beyond the Manufactured Home itself that its documents and filings do not support. Further, while Ms. Dawson's testimony and her photographs do not establish a value for the items, they do rebut the assertions of condition and extent of repairs in the Appraisal.

### 4. Conditions and Necessary Repairs

Ms. Dawson testified at length concerning the condition of the Manufactured Home. The photographs, admitted into evidence as noted above, showed cracked, peeling seals, and otherwise

damaged windows (Debtor's Ex. 6-14,17-20); an interior door off its hinges that must be replaced (Debtor's Ex. 16); a damaged exterior door (Debtor's Ex. 2-3); separating, discolored interior walls (Debtor's Ex. 5, 21-24); and numerous other items in a high state of disrepair in this twenty-seven year old Manufactured Home. Ms. Dawson also discussed broken or otherwise unusable appliances located within it, stating that the stove, refrigerator and other items are replacements from those that came with it when purchased nine years ago. Her testimony establishes that several appliances, most of the windows, and at least two doors, and other items must be replaced, not merely repaired. In addition, the photographs show holes in the floor, the repair of which is not included in the Appraisal.

In sum, Ms. Dawson's testimony overwhelmingly demonstrated that the Manufactured Home and its components are in worse condition than indicated by Mr. Keck in his testimony, and that the Manufactured Home requires repairs beyond those he listed.

### 5. Reconciling the Total Adjusted Retail Value

First, with respect to non-accession items, the Appraisal includes values for non-permanent accessions such as the refrigerator, outdoor steps and porch, wind tie down systems, and the central air conditioning system in his "Total Additional Figures" category, at an add-on value of $256.00, $664.00, $410.00 and $2,406.00 respectively. Other than the refrigerator, the other items are outside the "four walls" of the Manufactured Home and are not permanently affixed accession goods thereto as the photographs (Debtor's Ex. 1 to 25) entered into evidence and described in the testimony of Ms. Dawson demonstrate. Regardless, 21st Mortgage did not file a UCC-1 financing statement to extend its lien to non-affixed items. The asserted aggregate value of $3,736.00 for these non-accession goods may not be included in the Appraisal's Total Additional Features, and therefore is deducted from the $17,749.30 Total Adjusted Retail Value leaving $14,013.30.

Additionally, there is a credit for "Windows" of $556.00, even though there is an estimated $1,424.00 under "Total Repairs" for window repairs. Ms. Dawson's testimony and photographs evidence severe issues related to the windows including numerous cracks, ill-fitted replacement panes, and torn border stripping. Based thereon, any replacement or repair of the Manufactured Home would require completely new windows, which means the $556.00 credit contained in the Appraisal must be removed. The same analysis follows for "Deluxe House Type Exterior Door" which shows significant damage (Debtor's Ex. 2-3), but received a credit of $245.00. Based on the exhibits and testimony of Ms. Dawson and the photographic exhibits, $801.00 will be deducted, leaving a Total Adjusted Retail Value of $13,212.30.

Other problematic aspects to the Appraisal exist such as double-credits for the removable hitch/tow bar as that item appears under both the "Components" subcategory and the "Additive Values" subcategory, each with a credit of $93.00. Because of this double-count, $93.00 must be subtracted. Also, the Appraisal contains a line item for "WIND ZONE 2 COSTS." There was no testimony or other evidence which explained this line item or justified the $884.00 credit applied. Without further explanation, the court cannot approve this credit. The additional $977.00 for these items must be deducted, which results in a modified Total Adjusted Retail Value of $12,235.30.

Finally, as noted, Ms. Dawson's testimony demonstrated the need for significantly more repairs than the Appraisal allowed. While she did not testify as to what the cost of those repairs would be, a further reduction based on three categories at $250 each is reasonable in the view of the court based on its years of experience of reviewing mobile home valuations in similar chapter 13 cases. A further adjustment of $750.00 for additional repairs to the windows, walls, and floors are warranted given the conditions reflected in the photographs as expounded upon in Ms.

Dawson's testimony. Therefore, the final valuation amount for plan confirmation purposes is $11,485.30.

## CONCLUSION

Based on the foregoing, it is **ORDERED** and **DECREED** that:

1. The Manufactured Home's value is set and established as $11,485.30 as of the Petition Date and for plan confirmation purposes in this chapter 13 case.

2. Within twenty-one days of the date of this Order, the Debtor is directed to file an amended plan consistent with the findings herein, or alternatively dismiss the case.

3. The plan confirmation hearing is CONTINUED to a time and date as will be noticed after the amended plan is filed with appropriate opportunity for objection.

4. All other proper plan objections are deemed reserved.

**END OF DOCUMENT**